STATEWIDE GRIEVANCE COMMITTEE *v.*
NORMAN E. WHITNEY
(14594)

CALLAHAN, BORDEN, NORCOTT, KATZ and PALMER, Js.

Argued September 24—decision released November 16, 1993

*Norman E. Whitney,* pro se, the appellant (defendant).

*Daniel B. Horwitch,* statewide bar counsel, for the appellee (plaintiff).

KATZ, J. The Superior Court ordered that the defendant, Norman E. Whitney, be suspended from the practice of law for one year after he refused on several occasions to attend a pretrial conference in a criminal matter. In this appeal from the judgment of the trial

court imposing suspension, the defendant claims that: (1) the practice of scheduling mandatory pretrial conferences in criminal matters is unconstitutional under the state and federal constitutions; (2) General Statutes §§ 53a-172 and 53a-173[1] are unconstitutional under the state and federal constitutions; and (3) mandatory criminal pretrial conferences are used by Connecticut courts to demoralize defendants and impair their constitutional rights.[2] We reject these claims as bases for overturning the suspension and affirm the judgment of the trial court.

The essential facts are undisputed. In January, 1990, the defendant, a member of the Connecticut bar, filed an appearance on behalf of Francisco Ramos in the Hartford judicial district of the Superior Court. Ramos

---

[1] General Statutes § 53a-172 provides: "(a) A person is guilty of failure to appear in the first degree when, while charged with the commission of a felony and while out on bail or released under other procedure of law, he wilfully fails to appear when legally called according to the terms of his bail bond or promise to appear.

"(b) Failure to appear in the first degree is a class D felony."

General Statutes § 53a-173 provides: "(a) A person is guilty of failure to appear in the second degree when, while charged with the commission of a misdemeanor or a motor vehicle violation for which a sentence to a term of imprisonment may be imposed and while out on bail or released under other procedure of law, he wilfully fails to appear when legally called according to the terms of his bail bond or promise to appear.

"(b) Failure to appear in the second degree is a class A misdemeanor."

[2] The issues on appeal, as framed by the parties in their briefs, are as follows:

"1. Whether there is clear and convincing evidence that coerced criminal pretrials as practiced by Connecticut criminal trial courts are unconstitutional under the constitutions of Connecticut and the United States of America?

"2. Whether there is clear and convincing evidence that [General Statutes §§] 53a-172 and 53a-173 are applied unconstitutionally (both state and federal), relative to criminal defendants who exercise their rights in choosing whether or not they appear at pretrials?

"3. Whether there is clear and convincing evidence that repeated, coerced criminal pretrials are blatantly used by Connecticut courts to demoralize defendants and crush their ability to defend themselves by exercising their constitutional rights?"

had been charged by the state with the crimes of arson in violation of General Statutes § 53a-111, risk of injury to a child in violation of General Statutes § 53-21, and threatening in violation of General Statutes § 53a-62.[3] Prior to the scheduling of a pretrial conference, Ramos had been arraigned, had pleaded not guilty to all three charges and had elected a jury trial on all three counts.

On January 18, 1990, the defendant appeared in court at a bond hearing for Ramos. The court, *Norko, J.*, continued the case to February 2, 1990, for a pretrial conference, and ordered that the defendant, Ramos and the assistant state's attorney handling the case be present.[4]

On January 23, 1990, the defendant sent a letter to Judge Norko requesting that the court "have the case

---

[3] General Statutes § 53a-111 provides: "(a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied; or (2) any other person is injured, either directly or indirectly; or (3) such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss; or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury.

"(b) Arson in the first degree is a class A felony."

General Statutes § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

General Statutes § 53a-62 provides: "(a) A person is guilty of threatening when: (1) By physical threat, he intentionally places or attempts to place another person in fear of imminent serious physical injury, or (2) he threatens to commit any crime of violence with the intent to terrorize another, to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or (3) he threatens to commit such crime in reckless disregard of the risk of causing such terror or inconvenience.

"(b) Threatening is a class A misdemeanor."

[4] Ramos was unable to post bail at the time of his arrest and remained incarcerated during the pendency of his case.

set down for a firm jury" because a pretrial conference would be "absolutely senseless, time-consuming and unfairly expense-producing" and would be "a breach of [Ramos'] . . . rights under both the constitution of Connecticut and that of the United States."[5] The defendant did not appear in court on February 2, 1990. The court continued the case to February 16, 1990.

On February 14, 1990, the defendant sent another letter to Judge Norko, claiming that a pretrial conference would be "senseless" and a "sham performance," and would deny Ramos "constitutional treatment." When the defendant did not appear in court on February 16, Judge Norko questioned Ramos about his attorney's absence. Ramos stated that the defendant had told him that the defendant did not plan to attend the pretrial conference because he was unprepared. Ramos also indicated that the defendant had failed to communicate a plea offer to him.[6] The trial court, *Norko, J.*, fined the defendant $100 pursuant to General Statutes § 51-84[7] for the failure to appear and set the case down for another pretrial conference.

On four more occasions from February 16 to April 12, 1990, the defendant failed to appear in court for pretrial conferences as ordered. The court imposed another $100 fine pursuant to § 51-84 for failing to appear and continued the case on the firm trial list.

---

[5] The letter read in relevant part: "Rather than send me a notice of when that date [for the pretrial conference] might be, please merely have the case set down for a firm jury. It is absolutely senseless, time-consuming and unfairly expense-producing for both the State and Sr. Ramos for the State to coerce him to go to a hearing which is a breach of his constitutional rights under both the Constitution of Connecticut and that of the United States."

[6] The alleged failure to communicate the offer is not before this court.

[7] General Statutes § 51-84 provides in relevant part: "[A] court may fine an attorney for transgressing its rules and orders an amount not exceeding one hundred dollars for any offense, and may suspend or displace an attorney for just cause."

The defendant did not appear in court until August, 1990, when the case was called for trial. At that time, the defendant conferred with Ramos, the prosecutor and the trial judge, *Miano, J.,* and the state offered to reduce Ramos' charges. Ramos agreed to a disposition of his case on the reduced charges and to serve a short jail sentence followed by probation.

On April 19, 1990, a week after the defendant's final failure to appear for the pretrial conference, Judge Norko sent a letter to the plaintiff, the statewide grievance committee, that summarized the defendant's conduct in connection with Ramos' case. The statewide grievance committee referred Judge Norko's letter to a grievance panel that considered the letter, the transcripts from three of the days on which the defendant had failed to appear, and copies of the letters that the defendant had sent to Judge Norko.

Thereafter, the panel filed a formal complaint against the defendant with the statewide grievance committee[8]

---

[8] General Statutes § 51-90e provides in relevant part: "(a) Any person may file a written complaint alleging attorney misconduct. A grievance panel may, on its own motion, initiate and file a written complaint alleging attorney misconduct. A complaint against an attorney shall be filed with the state-wide bar counsel. Within five working days of the receipt of a complaint the state-wide bar counsel shall:

"(1) Forward the complaint to the appropriate grievance panel as determined under rules of court; and

"(2) Notify the complainant and the respondent, by certified mail, return receipt requested, of the panel to which the complaint was forwarded. The notification to the respondent shall be accompanied by a copy of the complaint."

Practice Book § 27F provides in relevant part: "(a) Any person, or a grievance panel on its own motion, may file a written complaint alleging attorney misconduct whether or not such alleged misconduct occurred in the actual presence of the court. Complaints against attorneys shall be filed with the statewide bar counsel. Within seven days of the receipt of a complaint the statewide bar counsel shall:

"(1) forward the complaint to a grievance panel in the judicial district in which the respondent maintains his principal office or his residence, pro-

that was forwarded to the grievance panel for the Hartford-New Britain judicial district. On August 9, 1990, that grievance panel found probable cause to believe that the defendant had violated rules 1.3, 3.4 (c), 3.5 (c) and 8.4 (d) of the Rules of Professional Conduct.[9] The reviewing subcommittee of the statewide grievance committee held a hearing on the complaint against the defendant,[10] and thereafter issued its proposed deci-

---

vided that, if the respondent does not maintain such an address in this state, the statewide bar counsel shall forward the complaint to any grievance panel; and

"(2) notify the complainant and the respondent, by certified mail with return receipt, of the panel to which the complaint was sent. The notification to the respondent shall be accompanied by a copy of the complaint."

[9] Rule 1.3 of the Rules of Professional Conduct provides: "A lawyer shall act with reasonable diligence and promptness in representing a client."

Rule 3.4 of the Rules of Professional Conduct provides in relevant part: "A lawyer shall not . . . (c) Knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists . . . ."

Rule 3.5 of the Rules of Professional Conduct provides in relevant part: "A lawyer shall not . . . (c) Engage in conduct intended to disrupt a tribunal."

Rule 8.4 of the Rules of Professional Conduct provides in relevant part: "It is professional misconduct for a lawyer to . . . (d) Engage in conduct that is prejudicial to the administration of justice . . . ."

General Statutes § 51-90f provides in relevant part: "(a) Each grievance panel shall investigate with the assistance of the grievance counsel assigned to such panel any complaint referred to it by the state-wide grievance committee or state-wide bar counsel to determine whether probable cause exists that the attorney is guilty of misconduct."

Practice Book § 27F provides in relevant part: "(c) The grievance panel, with the assistance of the grievance counsel assigned to it, shall investigate each complaint to determine whether probable cause exists that the attorney is guilty of misconduct."

[10] General Statutes § 51-90g provides in relevant part: "(a) The statewide grievance committee may designate at least three members of the committee, including at least one-third who are not attorneys, to serve as a reviewing subcommittee for each determination made by a panel on a complaint. . . .

"(b) Any hearing held by the committee or subcommittee shall be public and on the record. . . ."

Practice Book § 27J provides in relevant part: "(a) Upon receipt of the record from a grievance panel, the statewide grievance committee may

sion finding that the defendant had violated rules 1.3, 3.4 (c), 3.5 (c) and 8.4 (d), and recommending that he be presented to the Superior Court.[11]

The grievance committee adopted the reviewing subcommittee's proposed decision and recommendation, and filed an amended presentment of the defendant to the Superior Court pursuant to General Statutes § 51-90h (b) and Practice Book § 31.[12] The presentment alleged that the defendant had violated rules 1.3, 3.4 (c), 3.5 (c) and 8.4 (d) of the Rules of Professional Conduct.

assign the case to a reviewing committee which shall consist of at least three members of the statewide grievance committee, at least one third of whom are not attorneys. . . .

"(c) If the grievance panel determines that probable cause exists that the respondent is guilty of misconduct, the statewide grievance committee or the reviewing committee shall hold a hearing on the complaint."

[11] General Statutes § 51-90g provides in relevant part: "(c) The subcommittee shall conclude any hearing or hearings and shall render its proposed decision not later than ninety days from the date the panel's determination of probable cause or no probable cause was filed with the state-wide grievance committee. . . .

"(e) The subcommittee may propose in its decision to dismiss the complaint, reprimand the attorney or present the attorney to the superior court for reprimand, suspension or disbarment.

"(f) The subcommittee shall submit its proposed decision to the state-wide grievance committee, with copies to the complainant and respondent. The proposed decision shall be a matter of public record."

At the time in question, Practice Book § 27J provided in relevant part: "(e) Within ninety days of the date the grievance panel filed its determination of probable cause or no probable cause with the statewide grievance committee, the reviewing committee shall render its proposed decision and file it with the statewide grievance committee. . . . In its proposed decision, the reviewing committee shall recommend either dismissal of the complaint, reprimand of the respondent by the statewide grievance committee or presentment of the respondent to the superior court. The reviewing committee shall forward a copy of the proposed decision to the complainant and the respondent. The proposed decision shall be a matter of public record."

[12] General Statutes § 51-90h (b) provides in relevant part: "[T]he statewide grievance committee shall review the record before the subcommittee and any statements filed with it, and shall issue a decision dismissing the complaint, reprimanding the respondent, directing the state-wide bar

On August 18, 1992, the trial court, *Maloney, J.*, concluded that the defendant's repeated refusals to obey court orders to appear for pretrial conferences had violated rules 3.4 (c) and 8.4 (d). The trial court reprimanded the defendant and ordered him to pay the two $100 fines that had been imposed by Judge Norko. The court also ordered that the defendant be suspended from the practice of law for a one year period beginning September 5, 1992, if he did not pay the fines by September 4, 1992.

The defendant did not pay either of the two fines and was therefore suspended effective September 5, 1992.[13]

counsel to file a presentment against the respondent or referring the complaint to the same or a different reviewing subcommittee for further investigation and proposed decision."

At the time in question, Practice Book § 27M provided in relevant part: "[T]he statewide grievance committee shall issue a written decision either dismissing the complaint, reprimanding the respondent, directing the statewide bar counsel to file a presentment against the respondent in the superior court or referring the complaint to the same or a different reviewing committee for further investigation and a proposed decision."

Practice Book § 31 provides in relevant part: "(a) Presentment of attorneys for misconduct, whether or not the misconduct occurred in the actual presence of the court, shall be made by written complaint of the statewide grievance committee. Service of the complaint shall be made as in civil actions. Any interim proceedings to the contrary notwithstanding, a hearing on the merits of the complaint shall be held within sixty days of the date the complaint was filed with the court. At such hearing, the respondent shall have the right to be heard in his own defense and by witnesses and counsel. After such hearing the court shall render a judgment dismissing the complaint or imposing discipline as follows: reprimand, suspension for a period of time, disbarment or such other discipline as the court deems appropriate."

[13] Although the defendant's suspension expired prior to oral argument in this court, his appeal is not moot. Records pertaining to grievance complaints that are filed after July 1, 1986, and are not dismissed by the statewide grievance committee are available to the public. See Practice Book § 32 (b). Further, attorney suspensions are published in the Connecticut Law Journal. See Practice Book § 36A. In addition, General Statutes § 51-94 provides that "[i]n any proceeding for the suspension, displacement or removal of an attorney-at-law or to investigate the character, integrity or professional standing of such attorney, evidence tending to show the gen-

He appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We now affirm.

## I

Before turning to the defendant's specific claims, it is appropriate to discuss attorney disciplinary proceedings and the exact nature of the claims asserted by the defendant in this appeal. We have held that "[j]udges of the Superior Court possess the inherent authority to regulate attorney conduct and to discipline the members of the bar. . . . It is their unique position as officers and commissioners of the court . . . which casts attorneys in a special relationship with the judiciary and subjects them to its discipline. . . . [T]he judges have empowered the statewide grievance committee to file presentments in Superior Court seeking judicial sanctions against those claimed to be guilty of misconduct. . . . In carrying out these responsibilities . . . the [statewide grievance committee] is an arm of the court . . . ." (Citations omitted; internal quotation marks omitted.) *Sobocinski* v. *Statewide Grievance Committee*, 215 Conn. 517, 525–26, 576 A.2d 532 (1990). In presentment proceedings, the statewide grievance committee must prove by clear and convincing evidence that the attorney misconduct it alleges has occurred. *Statewide Grievance Committee* v. *Friedland*, 222 Conn. 131, 135, 609 A.2d 645 (1992); *Statewide Grievance Committee* v. *Presnick*, 215 Conn. 162, 171–72, 575 A.2d 210 (1990) (*Presnick I*); *Statewide Grievance Committee* v. *Presnick*, 216 Conn. 127, 134,

---

eral character, reputation and professional standing of such attorney shall be admissible." Prior misconduct of an attorney may, therefore, be considered in subsequent disciplinary proceedings. These collateral consequences for an attorney's reputation and professional standing make it clear that the defendant's appeal from his suspension is not moot. See, e.g., *Housing Authority* v. *Lamothe*, 225 Conn. 757, 765, 627 A.2d 367 (1993).

577 A.2d 1054 (1990) (*Presnick II*). If the trial court finds that misconduct has occurred, however, an attorney's "relation to the tribunal, and the character and purpose of the inquiry, are such, that unless it clearly appears that [the attorney's] rights have in some substantial way been denied him, the action of the court will not be set aside upon review." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Rozbicki*, 219 Conn. 473, 487, 595 A.2d 819 (1991), cert. denied, U.S. , 112 S. Ct. 1170, 117 L. Ed. 2d 416 (1992); *Presnick II*, supra, 132; *In re Durant*, 80 Conn. 140, 150, 67 A. 497 (1907). In presentment proceedings, the court conducts a trial de novo. *Presnick I*, supra, 167.

The trial court held that the defendant had violated rules 3.4 (c) and 8.4 (d) by openly disobeying Judge Norko's repeated orders to appear in court for pretrial conferences. The defendant does not claim that the trial court abused its discretion in making those findings.[14] His claims, rather, resemble affirmative defenses, i.e., that because criminal pretrial conferences are unconstitutional or unjust, his conduct should be excused.[15]

---

[14] In his closing argument before the trial court, the defendant made the following concessions. He stated that "the evidence is pretty obvious, virtually admitted." He conceded that he wilfully violated a court order and "annoyed, embarrassed, and whatever . . . done that to the court." The defendant did challenge whether his conduct violated rules 3.5 (c) and 1.3. of the Rules of Professional Conduct. He did not dispute, however, the allegations that he had violated Rules 3.4 (c) and 8.4 (d).

[15] The defendant asks this court to reverse the trial court and "find that the Appellant acted within the purview of the law in refusing to attend coerced criminal pretrials because to have so done would have compelled him to violate his attorney's oath and been against the Constitutions of the United States of America and Connecticut."

Both the defendant and the plaintiff have framed the issues in this appeal in terms of whether there is "clear and convincing evidence" that the claims asserted by the defendant are true. It is not clear, however, that the defendant in a presentment proceeding must meet this high burden of proof when he or she asserts claims resembling affirmative defenses. Because our disposition of the defendant's claims does not require us to reach their merits, we leave this issue for another day.

We therefore need not review the propriety of the trial court's findings that the defendant violated rules 3.4 (c) and 8.4 (d).[16]

## II

The defendant first claims that the practice of scheduling mandatory pretrial conferences in criminal matters is unconstitutional under the state and federal constitutions. He specifically challenges Practice Book §§ 700 through 706, which permit trial courts to schedule disposition conferences for criminal cases assigned for jury trials, and to compel the attendance of the parties and their attorneys.[17] The defendant claims that pretrial conferences ordered pursuant to these Practice Book provisions violate a criminal defendant's right

[16] More specifically, the defendant does not claim that the letters that he sent to Judge Norko in February, 1990, constitute the "open refusal based on an assertion that no valid obligation exists" needed to excuse a refusal to comply with a court's order under rule 3.4 (c) of the Rules of Professional Conduct. See footnote 9. The trial court held that the defendant's assertion that no valid obligation existed "was without the slightest legal foundation" and did not excuse the disobedience. Because the defendant does not ask us to review this holding, we need not consider whether the defendant's letters to Judge Norko, containing a bare assertion of unconstitutionality, constitute the kind of open refusal that the rule contemplates. Similarly, the defendant does not challenge the holding of the trial court that his conduct was "prejudicial to the administration of justice" under rule 8.4 (d). See footnote 9.

[17] Practice Book § 700 provides: "After conferring with the clerk, the presiding judge shall assign for disposition conferences so much of the jury trial list as he shall deem necessary for the proper conduct of the court and he shall direct the clerk to print and distribute a list of the cases so assigned to the appearing parties. The clerk shall schedule the conferences at times which will not interfere with the orderly calling of the court docket. Cases may also be assigned for a disposition conference at the time of the entry of a plea pursuant to Sec. 977."

Practice Book § 701 provides: "Unless an agreement has been reached in a previous plea discussion, a case will be assigned for a disposition conference. It shall be the duty of the prosecuting authority to notify the clerk if an agreement has been reached or if the case has been disposed of."

Practice Book § 702 provides: "The prosecuting authority, the defense counsel, and, in cases claimed for jury trial, the defendant shall appear at

against self-incrimination under the fifth amendment to the United States constitution,[18] the right to a speedy trial under the sixth amendment to the United States constitution,[19] and the right to a jury trial guaranteed by article first, § 19, of the Connecticut constitution.[20]

the time set for the disposition conference unless excused by the court. Requests for postponements shall be made only to the presiding judge and shall be granted upon good cause shown."

Practice Book § 704 provides: "The prosecuting authority and counsel for the defendant should attempt to reach a plea agreement pursuant to the procedures of Sec. 686."

Practice Book § 705 provides: "Should the parties be unable to reach an agreement as to disposition, they shall report to the presiding judge or to another judge assigned by him."

Practice Book § 706 provides: "If the parties reach an agreement which contemplates the entry of a plea of guilty or nolo contendere, they may advise the judicial authority in advance of the plea. The judicial authority may indicate whether he will concur in or reject the proposed disposition."

[18] The fifth amendment to the United States constitution provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

[19] The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

[20] Article first, § 19 of the Connecticut constitution as amended by article four of the amendments, provides: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

As a preliminary matter, we note that pretrial nego-
tiations play a critical role in the criminal justice sys-
tem. In *Szarwak* v. *Warden,* 167 Conn. 10, 17, 355 A.2d
49 (1974), we recognized "the importance of plea bar-
gaining in the administration of criminal justice."
Specifically, " '[d]isposition of charges after plea dis-
cussions is not only an essential part of the process but
a highly desirable part for many reasons. It leads to
prompt and largely final disposition of most criminal
cases; it avoids much of the corrosive impact of
enforced idleness during pretrial confinement for those
who are denied release pending trial; it protects the
public from those accused persons who are prone to
continue criminal conduct even while on pretrial
release; and, by shortening the time between charge
and disposition, it enhances whatever may be the
rehabilitative prospects of the guilty when they are ulti-
mately imprisoned. See *Brady* v. *United States,* 397
U.S. 742, 751–752 [90 S. Ct. 1463, 25 L. Ed. 2d 747]
(1970).' *Santobello* v. *New York,* [404 U.S. 257, 261, 92
S. Ct. 495, 30 L. Ed. 2d 427 (1971)]." *Szarwak* v. *War-
den,* supra; see also *Miller* v. *Commissioner of Correc-
tion,* 29 Conn. App. 773, 777, 617 A.2d 933 (1992); *State*
v. *Nelson,* 23 Conn. App. 215, 218, 579 A.2d 1104, cert.
denied, 216 Conn. 826, 582 A.2d 205 (1990), cert.
denied, 499 U.S. 922, 111 S. Ct. 1315, 113 L. Ed. 2d
248 (1991).

In *Santobello,* the United States Supreme Court
stated that plea bargaining "is an essential component
of the administration of justice. Properly administered,
it is to be encouraged. If every criminal charge were
subjected to a full-scale trial, the States and the Fed-
eral Government would need to multiply by many times
the number of judges and court facilities." *Santobello*
v. *New York,* supra, 260;[21] see also *Bordenkircher* v.

[21] In the civil context, we have noted that "[o]vercrowded dockets have
become a major problem challenging the ability of the courts of this state

*Hayes,* 434 U.S. 357, 361–62, 98 S. Ct. 663, 54 L. Ed. 2d 604, reh. denied, 435 U.S. 918, 98 S. Ct. 1477, 55 L. Ed. 2d 511 (1978) (plea bargaining is an important part of the criminal justice system); D. Wright, "Plea Bargaining—A Necessary Tool," 16 Conn. L. Rev. 1015 (1984).

The defendant concedes that pretrial negotiations are an important and necessary part of the criminal justice system, and acknowledges that they often benefit criminal defendants. Indeed, in this case, once discussions were finally held among the defendant, Ramos and the state's attorney's office, the case was disposed of favorably to Ramos. Despite the conceded benefits of pretrial negotiations, the defendant nevertheless claims that it is unconstitutional for a judge to compel a criminal defendant and his or her attorney to attend a pretrial conference.[22] The defendant has not, however, established any facts to support this claim. It does not appear that Ramos objected to having a pretrial conference, and there is nothing in the record to suggest that he was in any way prejudiced by the court's scheduling of a conference. Nor is there anything in

and elsewhere to dispense justice. It is well known that justice delayed is justice denied. In order to fulfill our responsibility of dispensing justice we in the judiciary must adopt an effective system of caseflow management." *In re Mongillo,* 190 Conn. 686, 690–91, 461 A.2d 1387 (1983). The need to manage overcrowded dockets is even more important in the criminal context, where we accommodate the defendant's right to a speedy trial under the sixth amendment to the United States constitution.

[22] The defendant does not contend that plea bargaining is unconstitutional, but does claim that any encouragement of plea bargaining by the courts is unconstitutional. In *State* v. *Lopez,* 197 Conn. 337, 350, 497 A.2d 390 (1985), however, we noted that "[b]oth federal and state cases have clearly established that plea bargaining is both *desirable and constitutional. Corbitt* v. *New Jersey,* 439 U.S. 212, 219, 99 S. Ct. 492, 58 L. Ed. 2d 466 (1978); *Bordenkircher* v. *Hayes,* 434 U.S. 357, 361–62, 98 S. Ct. 663, 54 L. Ed. 2d 604, reh. denied, 435 U.S. 918, 98 S. Ct. 1477, 55 L. Ed. 2d 511 (1978); *Staton* v. *Warden,* 175 Conn. 328, 331–33, 398 A.2d 1176 (1978)." (Emphasis added.) We fail to see how encouragement of a process that is both constitutional and desirable could be unconstitutional.

this record to support the defendant's claim that criminal defendants are compelled to incriminate themselves at pretrial conferences. Similarly, there is nothing in this record to support the defendant's claim that court ordered pretrial conferences prejudice a criminal defendant's right to a jury trial or to a speedy trial.[23] It is entirely possible that, had the defendant attended the February 2, 1990 pretrial conference as ordered by the court, the parties would have negotiated a disposition of the case, or Judge Norko would have set a firm jury trial date. This could have been accomplished without prejudicing Ramos' right to a speedy trial before a jury or in any way compelling him to incriminate himself.

"This court has frequently noted the imprudence of adjudicating constitutional questions in a 'factual vacuum.' *Lehrer* v. *Davis,* 214 Conn. 232, 234, 571 A.2d 691 (1990); *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill,* 203 Conn. 63, 75, 523 A.2d 486 (1987)." *State* v. *Floyd,* 217 Conn. 73, 78, 584 A.2d 1157 (1991). "[C]onstitutional issues do not exist in a vacuum. . . . ' "The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity." *Parker* v. *Los Angeles,* 338 U.S. 327, 333, 70 S. Ct. 161, 94 L. Ed. 144 (1949).' *Moore* v. *McNamara,* 201 Conn. 16, 21, 513 A.2d 660 (1986)." *Presnick I,* supra, 166.

In *Burritt Mutual Savings Bank of New Britain* v. *Tucker,* 183 Conn. 369, 439 A.2d 396 (1981), the defendant appealed from two findings of contempt entered against him for interfering with the activities of a court-appointed receiver of rents. Attempting to overturn the

---

[23] Practice Book § 707 specifically provides that "[i]f a case is not resolved at the disposition conference or if the judicial authority rejects the plea agreement, the case *shall be assigned for a trial.* If an agreement is reached, a judicial authority shall be available to accept guilty pleas and other dispositions." (Emphasis added.)

contempt findings, the defendant challenged the constitutionality of the Practice Book provisions governing the appointment of rent receivers. This court would not consider his claim, however, because the record did not contain any information on what transpired at the receivership proceedings. Id., 378. We stated that "[i]n challenging the constitutionality of any enactment a party *must demonstrate its adverse impact upon his own constitutionally protected rights. Kellems* v. *Brown,* 163 Conn. 478, 483, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973). Without a proper record we are unable to consider these claims of the defendant concerning the constitutionality of our procedure . . . ." (Emphasis added.) *Burritt Mutual Savings Bank of New Britain* v. *Tucker,* supra, 379. In this case, because the defendant has not provided a factual record to substantiate his claim that court-ordered criminal pretrial conferences are unconstitutional, we are unable to consider the merits of his claim.[24]

### III

The defendant's second claim is that General Statutes §§ 53a-172 and 53a-173[25] as applied to criminal defendants are unconstitutional under the state and federal constitutions. We note, first, that this issue was never raised before the trial court. "Only in the most exceptional circumstances will this court consider a claim that was not raised in the trial court." *Adolphson* v. *Zoning Board of Appeals,* 205 Conn. 703, 716, 535 A.2d 799 (1988); see also Practice Book § 4185 (this

---

[24] The defendant also has failed to provide an adequate legal basis for his claim. The only authority he cites in support of his claim that court-ordered criminal pretrials violate the state and federal constitutions is a handwritten notation on an application for a writ of habeas corpus that came before the Superior Court in 1983. *State* v. *Ringland,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 290065 (December 13, 1983).

[25] See footnote 1.

court "shall not be bound to consider a claim unless it was distinctly raised at the trial"); *Statewide Grievance Committee* v. *Friedland,* supra, 147; *Knight* v. *Bourbeau,* 194 Conn. 702, 704, 485 A.2d 919 (1984). This general rule against considering claims not raised at trial also applies to constitutional issues. *Berry* v. *Loiseau,* 223 Conn. 786, 828, 614 A.2d 414 (1992); *Roche* v. *Fairfield,* 186 Conn. 490, 505, 442 A.2d 911 (1982).

Even if exceptional circumstances were present in this case, we would not consider this claim because the defendant does not have standing to challenge the constitutionality of §§ 53a-172 and 53a-173. " 'According to well-established principles, a [party] who challenges the constitutionality of a statute must prove that the statute has adversely affected a constitutionally protected right "under the facts of his particular case and not merely under some possible or hypothetical set of facts not proven to exist." *Hardware Mutual Casualty Co.* v. *Premo,* 153 Conn. 465, 471, 217 A.2d 698 (1966) . . . .' *Weil* v. *Miller,* 185 Conn. 495, 501, 441 A.2d 142 (1981). ' "[J]udicial power is to be exercised to strike down legislation, whether state or federal, only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." *Poe* v. *Ullman,* [367 U.S. 497, 504, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961)] . . . .' *State* v. *Madera,* 198 Conn. 92, 106, 503 A.2d 136 (1985)." *DiBerardino* v. *DiBerardino,* 213 Conn. 373, 383, 568 A.2d 431 (1990); see also *Sassone* v. *Lepore,* 226 Conn. 773, 779, 629 A.2d 357 (1993); *Perry* v. *Perry,* 222 Conn. 799, 804, 611 A.2d 400 (1992); *Stern* v. *Stern,* 165 Conn. 190, 192, 332 A.2d 78 (1973) (to have standing, the appellant must allege " 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult questions' ").

By their terms, §§ 53a-172 and 53a-173 apply only to criminal defendants who fail to appear in court at a time when they are not incarcerated. Therefore, only criminal defendants, not their attorneys, may be penalized under the statute. Even if an attorney could somehow achieve standing to challenge the validity of these statutes based on the rights of his or her client, it is not possible in this case. Because Ramos was incarcerated on the days when the pretrial conferences were ordered to be held, §§ 53a-172 and 53a-173 could not have been applied to him. He was therefore never harmed or threatened with harm by these statutes and consequently would have no standing to challenge their constitutionality. The defendant therefore may not challenge the statutes based on his status as Ramos' attorney. Accordingly, we do not consider the defendant's second claim.

## IV

The defendant's third claim is that mandatory criminal pretrial conferences are used by Connecticut courts to demoralize defendants and impair their constitutional rights. Once again, a review of the record reveals that this issue was never raised in the trial court. Furthermore, there is absolutely no evidence to suggest that pretrial conferences were used to demoralize or otherwise prejudice Ramos in any way. We therefore will not consider this claim further.

The judgment is affirmed.

In this opinion the other justices concurred.